Filed 4/26/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| FRANCIS BOXER et al., | B258459 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC533572) |
| v. | |
| CITY OF BEVERLY HILLS, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Michael M. Johnson, Judge.  Affirmed.

Phan Trial Group, Luan K. Phan, Janet Ly; PB Law Group, Luan K. Phan; Esner, Chang & Boyer and Stuart B. Esner for Plaintiffs and Appellants.

Richards, Watson & Gershon and Saskia T. Asamura for Defendant and Respondent.

_____

Plaintiff homeowners appeal from a judgment entered after a demurrer to their inverse condemnation complaint was sustained without leave to amend. We affirm because plaintiffs allege only impairment of their views and a speculative risk of fire danger, neither of which constitutes a taking or damaging of their property.

**BACKGROUND**

Plaintiffs are the owners of homes on Spalding Drive in Beverly Hills. They filed an inverse condemnation action against the City of Beverly Hills (the City), seeking damages and injunctive relief based upon impairment of the views from their backyards by coastal redwood trees the City planted in Roxbury Park. Plaintiffs' first amended complaint (FAC) alleges that plaintiffs "were accustomed to having an unobstructed view of the hills of Beverly Hills, the Hollywood Hills, and the Los Angeles basin, including the Hollywood sign, the Griffith Observatory, downtown Los Angeles, and—on a clear day—Mounty Baldy 50 miles away." In 1989, however, the City "planted thirty (31) [*sic*] Sequoia (Coastal) redwood trees, the tallest-growing species in the world . . . . The redwood trees grow each year and their height is now starting to block the previously unobstructed view of Plaintiffs. As the redwood trees continue to grow, they will block out the entire view of Plaintiffs."

The FAC alleges plaintiffs expressed their concerns to the City in 2005, and the City represented the redwood trees would be trimmed and ones that were "not structurally sound" would be removed. For a while thereafter, the City trimmed the redwoods, but "failed to remove some poor quality redwood trees which are potential fire hazards. Also, the City has now allowed the trees to grow substantially without trimming. In 2013, Plaintiffs again asked the City to address their concerns, but this time, the City simply ignored Plaintiffs' concerns."

The FAC further alleges, "As a direct and proximate result of Defendants' [*sic*] plan, design, and maintenance of the redwood trees, there has been an impairment of views to Plaintiffs' properties and increased risk of fire hazard." "The above-described damage to Plaintiffs' properties were [*sic*] proximately caused by Defendants' [*sic*]

2

actions, failure to act, and/or failure to minimize damages in that Defendants' [*sic*] plan, design, and maintenance of the redwood trees has impaired the value of Plaintiffs' properties and increased risk of fire hazard."

The City demurred to the FAC as failing to state a cause of action for several reasons, including that, "as a matter of law, inverse condemnation provides no remedy for alleged impairment of view from private property" or "for emotional distress due to fear of potential future fire hazards or speculative claims for alleged possible future impact of a possible future fire hazard that has not materialized so as to cause any actual physical damage to private property."

Plaintiffs opposed the demurrer on essentially the same theories they raise on appeal.

The trial court sustained the demurrer without leave to amend, explaining that the plaintiffs had not surmounted "the initial hurdle" of alleging "the kind of injury that establishes a taking under the inverse condemnation law." The court distinguished authorities upon which the plaintiffs relied because they addressed the measure of damages in eminent domain cases, not the element of whether a taking occurred. The court cited *Regency Outdoor Advertising, Inc. v. City of Los Angeles* (2006) 39 Cal.4th 507 (*Regency*), as "a compelling precedent": "They had the property to display billboards. Billboards are worthless if no one can see them. They had alleged that their visibility was impaired by trees that had been planted by the city. In our case, I certainly accept that view is important to the property owners, but it's one of a vast many attributes that can be identified with the plaintiffs' properties. It's certainly not an indispensable attribute as it was in *Regency*. [¶] By my reading, if the Supreme Court held in *Regency* that visibility and view under those circumstances was not the kind of cognizable injury that would establish a taking, I think that it's very clear that it is not here. As I said in my [tentative] ruling, it did not appear to me that the plaintiffs could allege any additional facts that would change the outcome." The court later added, "[T]here is not any legal authority to support the nature of the injury or taking that plaintiffs have alleged here."

3

Plaintiffs filed a timely appeal after the trial court dismissed the action.

## DISCUSSION

### 1. Pertinent legal principles

A demurrer tests the sufficiency of the complaint by raising questions of law. (*Aragon-Haas v. Family Security Ins. Services, Inc.* (1991) 231 Cal.App.3d 232, 238.) A general demurrer admits the truth of all material factual allegations of the complaint, but not the truth of contentions, deductions, or conclusions of fact or law. (*Moore v. Regents of University of California* (1990) 51 Cal.3d 120, 125.) On appeal from dismissal after a demurrer is sustained without leave to amend, this court independently reviews the sufficiency of the pleading and affirms if any ground raised in the demurrer is well taken. (*Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 13.) Where the pleading is insufficient, however, we review the denial of leave to amend for abuse of discretion. (*Id.* at p. 12.) "A trial court abuses its discretion in sustaining a demurrer without leave to amend if there is a reasonable possibility a defect in the complaint can be cured by amendment or if the pleading can be liberally construed to state a cause of action." (*Ibid.*) However, the burden is on the plaintiff to demonstrate how he can amend his complaint and how the proposed amendment will change the legal effect of the pleading. (*Community Cause v. Boatwright* (1981) 124 Cal.App.3d 888, 902.)

Both eminent domain proceedings and inverse condemnation actions implement the constitutional rule that private property may not be "taken or damaged" (Cal. Const., art. I, § 19) for public use without just compensation. But "inverse condemnation and eminent domain proceedings are not identical. A property owner initiates an inverse condemnation action, while an eminent domain proceeding is commenced by a public entity. [Citation.] Eminent domain actions typically focus on the amount of compensation owed the property owner, since by initiating the proceeding the government effectively acknowledges that it seeks to 'take or damage' the property in question." (*Regency*, *supra*, 39 Cal.4th at p. 530.) "But the same is not true of inverse condemnation: '. . . in an inverse condemnation action, the property owner must first

4

clear the hurdle of establishing that the public entity has, in fact, taken [or damaged] his or her property before he or she can reach the issue of "just compensation."'" (*San Diego Gas & Electric Co. v. Superior Court* (1996) 13 Cal.4th 893, 939–940 (*Covalt*).)

"Property is 'taken or damaged' within the meaning of article I, section 19 of the California Constitution, so as to give rise to a claim for inverse condemnation, when: (1) the property has been physically invaded in a tangible manner; (2) no physical *invasion* has occurred, but the property has been physically *damaged*; or (3) an intangible intrusion onto the property has occurred which has caused no damage to the property but places a *burden* on the property that is direct, substantial, and peculiar to the property itself." (*Oliver v. AT&T Wireless Services* (1999) 76 Cal.App.4th 521, 530 (*Oliver*).)

"When, as here, the conduct of a public entity results in an intangible intrusion onto the plaintiff's property that does not physically damage the property, the question whether there has been a 'taking or damaging' of the property sufficient to support a cause of action for inverse condemnation is more difficult. In these circumstances the plaintiff must allege that the intrusion has resulted in a burden on the property that is direct, substantial, and peculiar to the property itself." (*Covalt*, *supra*, 13 Cal.4th at p. 940.) "[A] burden on neighboring property is sufficiently direct and substantial if the neighboring landowner can establish that the consequences of the intangible intrusion are 'not far removed' from a direct physical intrusion." (*Oliver*, *supra*, 76 Cal.App.4th at p. 531.) Neither the mere existence of a public use or a diminution in the value of the plaintiff's property establishes a compensable taking or damaging of the property. (*Covalt*, *supra*, 13 Cal.4th at pp. 941–942.) Rather, a diminution in value of the plaintiff's property is "an element of the measure of just compensation when such taking or damaging is otherwise proved." (*Id.* at p. 942.)

Intangible intrusions have been recognized as sufficient to constitute a taking or damaging of property in limited circumstances, such as the intrusion into the plaintiffs' home of strong offensive odors emanating from an adjacent, upwind sewage treatment facility rendering the plaintiffs' home uninhabitable and causing the plaintiffs nausea and

5

burning eyes. (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 289, 294, 297–299.) Or noise, dust, and debris from a freeway expansion that included a 23-foot embankment directly in front of the plaintiffs' home, causing physical damage and respiratory problems. (*Harding v. State of California* ex rel. *Dept. of Transportation* (1984) 159 Cal.App.3d 359, 362, 365–367.) Or noise from commercial jet aircraft landing and taking off that substantially interfered with the use and enjoyment of neighboring residential property. (*Aaron v. City of Los Angeles* (1974) 40 Cal.App.3d 471, 486, 493.)

"[U]nder California law, a landowner has no right to an unobstructed view over adjoining property." (*Posey v. Leavitt* (1991) 229 Cal.App.3d 1236, 1250 [nuisance action by one neighbor against another] (*Posey*).) "As a general rule, a landowner has no natural right to air, light or an unobstructed view and the law is reluctant to imply such a right. [Citations.] Such a right may be created by private parties through the granting of an easement [citations] or through the adoption of conditions, covenants and restrictions . . . or by the Legislature [citations]. Local governments may also protect views and provide for light and air through the adoption of height limits." (*Pacifica Homeowners' Assn. v. Wesley Palms Retirement Community* (1986) 178 Cal.App.3d 1147, 1152 [action for injunctive relief alleging height of trees in neighboring property interfered with easement to light, air, and unobstructed view] (*Pacifica*).)

**2.      The trial court properly sustained the demurrer without leave to amend.**

Plaintiffs do not allege any physical intrusion, occupation, or invasion of their property or any physical damage to their property. The trees of which the plaintiffs complain were not located on the plaintiffs' properties and the FAC does not allege that the trees or debris from the trees physically intrudes upon the plaintiffs' properties. Plaintiffs necessarily rely upon the intangible intrusion theory and argue that because a "property owner's loss of view is an aspect of compensable damage" in eminent domain cases, the impairment of their views is a harm sufficient to support their inverse condemnation claims.

6

Plaintiffs' argument is unsound for several reasons. First, it essentially posits that damage to the value of plaintiffs' properties establishes a compensable taking or damaging of the property, which is simply wrong. (*Covalt*, *supra*, 13 Cal.4th at p. 942.) In *Covalt*, the plaintiffs based their inverse condemnation claim on a utility's expansion of power lines near their home, which they contended constituted a taking or damaging because the value of their property had been reduced due to the increase in electro-magnetic fields entering their property. The Supreme Court rejected this claim, noting, "Plaintiffs' repeated claim that such fields caused a diminution in the *value* of their property does not supply the missing burden: a diminution in property value is not a 'taking or damaging' of the property, but an element of the measure of just compensation when such taking or damaging is otherwise proved." (*Id.* at p. 942.)

Next, the cases cited by plaintiffs in an attempt to establish that impairment of a view is itself a taking or damage do not support their claim. Plaintiffs cite a number of cases addressing compensation for a loss of view where there was a physical taking of the claimant's property, for example, *Pierpont Inn, Inc. v. State of California* (1969) 70 Cal.2d 282 [inverse condemnation action by inn owner after state built freeway on portion of inn's land], and *City of Livermore v. Baca* (2012) 205 Cal.App.4th 1460 [eminent domain action by city that took portions of commercial property for improvement of intersection]. These cases did not involve a mere impairment of view, but an undeniable physical taking of the property in question by the public entity. The respective courts ruled that impairment of view was a potential component of the just compensation required for the physical taking. The *Pierpont* court explained: "Where the property taken constitutes only a part of a larger parcel, the owner is entitled to recover, *inter alia,* the difference in the fair market value of his property in its 'before' condition and the fair market value of the remaining portion thereof after the construction of the improvement on the portion taken. Items such as view, access to beach property, freedom from noise, etc. are unquestionably matters which a willing buyer in the open market would consider in determining the price he would pay for any given piece of real

7

property. Concededly such advantages are not absolute rights, but to the extent that the reasonable expectation of their continuance is destroyed by the construction placed upon the part taken, the owner suffers damages for which compensation must be paid." (70 Cal.2d at p. 295.) The *Baca* court cited *Pierpont* in ruling the trial court improperly prevented the land owner from introducing evidence "that the project negatively affected his property's view and curb appeal." (205 Cal.App.4th at pp. 1467–1468.) These cases do not support the proposition that mere impairment of views constitutes a taking or damaging of property. As the Supreme Court explained in *Regency*, *supra*, 39 Cal.4th at pages 519–520: "[C]ourts also have recognized a compensable visibility interest when government action that includes a partial physical taking of a landowner's property impairs the visibility of its remainder, as seen from the adjacent road. [Citations.] In these cases, the 'right to be seen' bears upon the value of the residual parcel. In other words, the diminution of visibility in these circumstances does not, by itself, result in the taking or damaging of property, but once a physical taking is established, such diminution is taken into account in determining damages in a condemnation or inverse condemnation proceeding." (Fn. omitted.)

Plaintiffs also cite *Goycoolea v. City of Los Angeles* (1962) 207 Cal.App.2d 729 (*Goycoolea*), an inverse condemnation action in which the owner of residential real estate sought compensation for changes to the street in front of her property resulting from building an overpass for Hill Street above Sunset Boulevard. The overpass resulted in the plaintiff's street being reduced in width from 80 feet to 29 feet and made one-way. It also impaired access to Sunset Boulevard and the freeway from the plaintiff's street. In addition, the embankment of the overpass opposite the plaintiff's property rose 10 to 13 feet above the grade of her street. (*Id.* at pp. 731–733.) The appellate court affirmed a judgment awarding the plaintiff compensation for the diminution in value of her property and explained: "An owner of property abutting upon a public street has a property right in the nature of an easement in the street which is appurtenant to his abutting property. That easement is one of ingress and egress to and from his property or, generally, the

8

right of access over the street to and from his property. If there is a substantial impairment of that right, compensation must be given." (*Id.* at p. 733.)

The *Goycoolea* court continued: "With respect to the street in front of his land, an abutting owner has an easement of light and air. [Citations.] He has also an easement of reasonable view of his property from the street or highway. [Citations.] While the interference with the easement of light and air caused in the present case by the embankment does not appear to have been of the magnitude of that evident in *Anderlik v. Iowa State Highway Com.* [(1949)] 240 Iowa 919 [38 N.W.2d 605], it cannot be said that the evidence of that interference was of such an insignificant nature that the city suffered prejudice requiring a reversal of the judgment because of the finding that the plaintiff's property has been 'substantially deprived' of light and air. With respect to the easement of reasonable view of the property from the public street, it was for the trial court to determine whether the embankment has unreasonably diminished the visibility of the plaintiff's property, insofar as travelers on the elevated portion of the thoroughfare are concerned, so as to cause a substantial impairment of that right." (207 Cal.App.2d at pp. 735–736.)

In *Regency*, *supra*, 39 Cal.4th at page 520, footnote 7, the Supreme Court rejected the notion that *Goycoolea* is authority for impairment of visibility constituting a taking of or damage to property: "Two Court of Appeal decisions (*United Cal. Bank v. People ex rel. Dept. Pub. Wks.* [(1969)] 1 Cal.App.3d [1,] 7; *Goycoolea v. City of Los Angeles*, *supra*, 207 Cal.App.2d at p. 735) identified a visibility right in situations in which there was no physical taking of private property, but there was a substantial impairment of the right of access to and from the affected parcels due to road work by the government. While these decisions discuss a 'right' to visibility, in both cases the reduced visibility was tethered to a compensable claim of impaired physical access. (See *United Cal. Bank v. People ex rel. Dept. Pub. Wks.*, *supra*, 1 Cal.App.3d at p. 7; *Goycoolea v. City of Los Angeles*, *supra*, 207 Cal.App.2d at pp. 735–736.) Both *United Cal. Bank* and *Goycoolea*, therefore, can be reconciled with cases involving partial physical takings, in that these

9

two decisions considered a diminution of visibility in ascertaining the ramifications of government action that also took or damaged a properly compensable property interest. Contrary to Regency's characterization of these decisions, neither *United Cal. Bank* nor *Goycoolea* stands for the proposition that a reduction of visibility, on its own, requires the payment of compensation."

The third problem with plaintiffs' theory of recovery is that it is contrary to applicable authority, including *Regency*, *supra*, 39 Cal.4th 507, in which the Supreme Court affirmed a judgment in favor of the City of Los Angeles, which had planted palm trees on its own property along both sides and in the median of Century Boulevard near the airport. Regency, which leased property along Century Boulevard for its billboards, claimed the trees reduced the visibility of some of its billboards and filed an action for inverse condemnation and breach of contract. Regency admitted the trees did not physically occupy its property or interfere with ingress to or egress from its property. (39 Cal.4th at pp. 513–514.) It instead claimed the trees "damaged its 'right of visibility, i.e. the right of the property owner to have the property seen from the adjacent public street.'" (*Id.* at p. 516.) As previously addressed, the Supreme Court acknowledged that "a compensable visibility interest" has been recognized when the government has physically taken part of someone's property, but this is merely an aspect of the owner's damages, and is not itself a taking or damaging of the property. (*Id.* at pp. 519–520.) In contrast, where the government takes "action having the sole allegedly injurious effect of reducing the visibility of roadside property as seen from the street," "[t]he virtually unanimous rule" "provides that any such impairment to visibility does not, in and of itself, constitute a taking of, or compensable damage to, the property in question." (*Id.* at p. 520.) The court decided to "follow the weight of authority and conclude that Regency has no visibility right warranting compensation here." (*Id.* at p. 522.) The court explained: "Local governments have long planted trees along roads for aesthetic reasons, to lessen the burdens of climate, and for other salubrious purposes. . . . When such landscaping is involved, at least absent unusual circumstances not present here, denying

compensation for reduced visibility, in and of itself, without an additional showing of a partial physical taking or substantially impaired access, visits no unfairness upon property owners or others who occupy roadside parcels." (*Ibid.*)

The *Regency* court further explained that planting the trees could be viewed as an application of land-use regulations and police power, including "the government's well-established prerogative to plant trees on its own property": "Meanwhile, even if one were to assume that the trees prevented abutting owners from displaying billboards on their property, this would represent, at worst, one manifestation of 'traditional land-use regulations' that 'have long been held to be valid exercises of the city's traditional police power, and do not amount to a taking merely because they might incidentally restrict a use, diminish the value, or impose a cost in connection with the property. [Citations.]'" (*Regency*, *supra*, 39 Cal.4th at p. 523.)

Plaintiffs argue that *Regency* is distinguishable because it concerned a view *of* property, rather than a view *from* property. While this is factually correct, it is of little, if any, consequence. We note that *Regency* cited, with apparent approval, *Katcher v. Home S. & L. Assn.* (1966) 245 Cal.App.2d 425, 429, with the following parenthetical: "[explaining, in a case involving a claimed right to a view *from* the plaintiffs' property over that of another, that it 'has long been established in this state that a landowner has no easement over adjoining land for light and air in the absence of an express grant or covenant']." (*Regency*, *supra*, 39 Cal.4th at p. 518, fn. 4.) Moreover, as previously noted, in cases involving a private party's impairment of another's view from his, her, or its property, it is well recognized that a landowner does not have a right to an unobstructed view over adjoining property. (*Posey*, *supra*, 229 Cal.App.3d at p. 1250; *Pacifica*, *supra*, 178 Cal.App.3d at p. 1152.) Given this well-established principle, "the government's well-established prerogative to plant trees on its own property" (*Regency*, *supra*, 39 Cal.4th at p. 523), and plaintiffs' failure to even argue, much less cite any authority supporting the proposition that obstruction of a view by a governmental entity somehow creates a right to a view that would not exist if the obstruction had been caused

11

by a private party, we conclude that *Regency* applies here, notwithstanding the factual differences. Moreover, even if we were to conclude that *Regency* is distinguishable from the present case, it would still leave plaintiffs without any authority supporting their claim that obstruction of view amounts to an intangible intrusion onto their property or is otherwise sufficient to constitute a taking of or damage to their property. As stated in *Pacifica*, *supra*, 178 Cal.App.3d at page 1152, although private parties or a legislative body may create a right to an unobstructed view, courts are reluctant to imply such a right.

The view *from* the plaintiffs' property was at issue in *Oliver*, *supra*, 76 Cal.App.4th 521. There, the plaintiffs' neighbors had previously leased a portion of their land near the boundary with the plaintiffs' land for construction of a cellular telephone transmission tower, without any complaint by the plaintiffs. After the tower was replaced by a new, taller tower, the plaintiffs filed suit, pleading inverse condemnation and nuisance against the cell phone companies, the county, and their neighbors. (*Id.* at pp. 524–525.) The appellate opinion described the plaintiffs' claims: "Plaintiffs' primary complaint about the new tower is 'visual.' They find it a 'big eyesore' and 'oppressive.' They contend that it 'looms' over their property. [¶] Plaintiffs also observe that the tower produces a 'strumming' noise when the wind blows and that the outbuilding produces an intermittent 'hum' sound. However, the cell site emits no offensive odors or other effluent, and caused no actual physical damage to plaintiffs' property." (*Id.* at p. 527.) The appellate court observed that, based upon the evidence presented in the context of a summary judgment motion, "the burden imposed on plaintiffs' property by the new tower and its attendant equipment does not resemble the type of perceptible intrusion, such as strong odors, overpowering noise, dust, vibration, or the loss of light, which directly and substantially burden the property so as to give rise to an inverse condemnation claim." (*Id.* at p. 531.) The tower was visible from the plaintiffs' house only through one small window, the noises from the tower were neither loud nor disruptive, the tower had not physically harmed the plaintiffs, and it created no odor,

dust, or vibrations. (*Id.* at pp. 531–532.) The appellate court concluded "that the mere displeasing appearance in size and shape of a neighboring structure that is otherwise permitted by law, the only admitted effect of which is an alleged diminution in value of the adjacent property, cannot constitute a nuisance or give rise to an inverse condemnation claim. Since a landowner has no natural right to an unobstructed view (*Posey*[, *supra*,] 229 Cal.App.3d [at p.] 1250), the size and shape of an otherwise lawful structure on one side of a boundary cannot be deemed either to damage (for purposes of inverse condemnation) or to interfere with the enjoyment (for purposes of nuisance) of that which is on the other side of the boundary." (*Oliver*, *supra*, 76 Cal.App.4th at p. 525, fn. omitted.)

As in *Oliver*, plaintiffs' complaint in this case is strictly visual. But they do not have a property right to an unobstructed view, and they have not alleged that either the trees in question or anything associated with the trees physically invades their property, either tangibly or intangibly. They have not alleged any intrusion at all, let alone one with consequences not far removed from a direct physical intrusion. Therefore plaintiffs cannot maintain an inverse condemnation cause of action.

We note that although the FAC alleges the trees increase the risk of fire hazard, they have not argued this theory on appeal. The City's responsive brief argued that plaintiffs abandoned this theory, and plaintiffs' reply brief failed to address this contention. Moreover, this "risk" is entirely speculative, i.e., that the trees plaintiffs allege are of "poor quality" will catch fire and that such a fire will threaten their properties. As stated in *Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1257, "'[t]he very definition of a "taking" requires an "act" . . . , and the risk of future flooding is not an act.'" Similarly, the speculative risk of some of the trees catching fire is not an act sufficient to a constitute taking or damaging of plaintiffs' properties.

Plaintiffs vigorously contend it was improper to terminate their case by demurrer because their claim raised factual issues and mixed issues of law and fact. Most complaints do. However, if a plaintiff pleads a claim that fails to state a cause of action,

13

a demurrer is properly sustained, as in the present case. Moreover, with respect to inverse condemnation actions, we note that *Covalt*, *supra*, 13 Cal.4th 893, addressed the propriety of an order overruling a demurrer, and the Supreme Court affirmed the Court of Appeal's writ directing the trial court to sustain the demurrer. (*Id.* at pp. 912–913 & fn. 17.)

Finally, we further note that in the trial court plaintiffs requested leave to amend to cure any defects, but failed to suggest any additional facts they could plead. On appeal they have not argued that the trial court abused its discretion by denying them leave to amend and still have not suggested any possible curative amendment. Under all the circumstances of this case, it does not appear that plaintiffs could allege any additional or new facts sufficient to state a cause of action. No amendment could cure the inherent fatal defect in their inverse condemnation claim based upon impairment of their views.

## DISPOSITION

The judgment is affirmed. Respondent is awarded its costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, J.

We concur:


CHANEY, Acting P. J.


JOHNSON, J.