Filed 8/24/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MERCURY CASUALTY COMPANY, | B266959 & B268452 |
| Plaintiff and Respondent, | Los Angeles County Super. Ct. No. BC488745 |
| v. | |
| CITY OF PASADENA, | |
| Defendant and Appellant. | |

APPEALS from a judgment and order of the Superior Court of Los Angeles County, Richard L. Fruin, Jr., Judge. Reversed with directions.

Richards, Watson, & Gershon, Robert C. Ceccon, Saskia T. Asamura, T. Peter Pierce, and Stephanie Cao; Michelle Beal Bagneris, Ann S. Rider, and Javan N. Rad, for Defendant and Appellant.

Law Offices of Robert A. Stutman, Timothy E. Cary, Brian M. Wong, and Nathan R. Hurd, for Plaintiff and Respondent.

Moscone Emblidge Otis, G. Scott Emblidge and Erin H. Reding, for Amicus Curiae the League of California Cities, the California State Association of Counties, California Park and

Recreation Society, Professor Daniel P. Selmi, and Professor John Echeverria on behalf of Defendant and Appellant.

Jonathan M. Coupal, Trevor A. Grimm, Timothy A. Bittle, and Brittany A. Sitzer for Amicus Curiae Howard Jarvis Taxpayers Foundation on behalf of Defendant and Appellant.

---

## INTRODUCTION

In 2011, a storm brought hurricane-force winds to the City of Pasadena (City), uprooting more than 2,000 trees. One of those trees fell on the home of Sarah and Christopher Dusseault, causing severe property damage. Before it fell, the tree stood in a parkway that abuts the Dusseaults' property. Although the City owned the tree, there is no record of who planted it.

In 2012, Mercury Casualty Company (Mercury), the Dusseaults' insurer, sued the City for inverse condemnation. After a bench trial, the trial court entered judgment in Mercury's favor, finding the tree that fell on the Dusseualts' home was a work of public improvement that supported an inverse condemnation claim. The court awarded Mercury $800,000 in damages for insurance benefits paid to the Dusseaults, and an additional $329,170 in costs under Code of Civil Procedure section 1036.

On appeal, the City contends the court erred in finding it liable under a theory of inverse condemnation. We conclude the tree that fell on the Dusseaults' home does not constitute a work of public improvement for purposes of an inverse condemnation claim. Because the City could not be held inversely liable for the

2

damage caused to the Dusseaults' home, we reverse the judgment and subsequent order awarding costs.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. The City's Urban Forest

The City owns more than 60,000 trees as part of its "urban forest." The City adopted its first formal policy addressing city-owned trees in 1940, when it published the "Official Street Tree List." The list designated an official tree for each street in the City.[2] The list did not include an inventory of the City's then-existing trees or establish any procedures or guidelines for pruning, removing, or otherwise maintaining city-owned trees.

In 1976, the City adopted a "Master Street Tree Plan," which listed the official tree for each street in the City and included an inventory of the City's then-existing trees.[3] Like the Official Street Tree List, the Master Street Tree Plan did not establish any procedures or guidelines for removing or otherwise

---

[1]     The City also appeals from the court's order awarding costs, including attorney fees, under Code of Civil Procedure section 1036. Because costs under that section can only be awarded to a plaintiff who is successful in bringing an inverse condemnation claim (see Code Civ. Proc., § 1036), we also reverse that order.

[2]     According to the City's Forestry Superintendant, an official tree is a species of tree the City prefers to plant on city-owned property adjacent to each of its streets. The Official Street Tree List named the Red Box Eucalyptus as the official tree for Hillside Terrace, where the tree at issue in this case (a Canary Island Pine) was located.

[3]     In the Master Street Tree Plan, the City changed the official tree for Hillside Terrace from Red Box Eucalyptus to Canary Island Pine.

maintaining city-owned trees.  In 1989, the City published an updated inventory of its trees.

In 1992, the City adopted Municipal Code Chapter 8.52, entitled "City Trees and Tree Protection Ordinance" (Ordinance).[4] The Ordinance established city-wide policies for protecting, maintaining, and removing trees that are part of the City's urban forest.[5]

The Ordinance identifies the types of trees that fall within its scope, including "Public Trees" (public trees) and "Street Trees" (street trees).  The Ordinance defines a public tree as "a tree located in a place or area under ownership or control of the city including but without limitation streets, parkways, open

---

[4]     The City amended the Ordinance in 2002 and 2010.

[5]     Section 8.52.015 states that the purposes of the Ordinance are to:  "[p]reserve and grow Pasadena's canopy cover by protecting landmark, native and specimen trees on specified areas of private property and expanding the protection of street trees and trees on public property[;]  [¶] [s]afeguard the City's urban forest by providing for the regulation of the protection, planting, maintenance and removal of trees in the city[;] [¶] [p]rotect the visual and aesthetic character of the city[;] [¶] [i]mprove and enhance property values by conserving and adding to the distinctive and unique aesthetic character of the many areas of Pasadena[;] [¶] [i]mprove the quality of life for residents, visitors and wildlife[;] [¶] [c]reate favorable conditions for the protection of designated landmark, native and specimen trees, for the benefit of current and future residents of Pasadena[;] [¶] [m]aintain and enhance the general health, safety and welfare of the city and its residents by assisting in counteracting air pollution and in minimizing soil erosion and other related environmental damage[;] [¶] [p]rotect and maintain healthy trees in the land use planning processes as set forth herein[;] [¶] [and] [e]stablish procedures and practices for fulfilling the purposes of this city tree and tree protection ordinance."

4

space, parkland and including city owned property under the operational control of another entity by virtue of a lease, license, operating or other agreement." The Ordinance defines a street tree as "any public tree whose trunk is located primarily within any parkway, public sidewalk, street median, traffic island or other right of way under the ownership or control of the city by easement, license, fee title or other permissive grant of use."

The Ordinance does not establish specific design standards or parameters for the planting or removal of street trees, nor does it include any maintenance or pruning schedules for street trees. The Ordinance does, however, prohibit members of the public from pruning, removing, or otherwise injuring any street trees, and it establishes a procedure through which members of the public may request the City to inspect, remove, or prune a street tree.

The City Manager is tasked with implementing the Ordinance. The City Manager's responsibilities include, among other things: planting, maintaining, caring for, and removing trees covered by the Ordinance; developing maintenance standards for trees located in public places; issuing permits under the Ordinance; and enforcing the Ordinance by issuing compliance orders or administrative citations.

In either 2005 or 2010, the City implemented a policy of inspecting and maintaining its street trees every five years. A certified arborist testified that the City's five-year maintenance schedule was consistent with the industry standard for

5

maintaining trees and exceeded the standards used by most other cities.[6]

## 2. The Dusseaults' Property

In 2004, Sarah and Christopher Dusseault purchased a home on Hillside Terrace in Pasadena. The Dusseaults' property is separated from the street by a 20-foot-wide dirt parkway that the City owns. At the time the Dusseaults purchased their home, four Canary Island Pine trees stood in the parkway.[7] The trees were planted in the late 1940s or early 1950s by an unknown party.[8]

---

[6] While this appeal was pending, we granted Mercury's request for judicial notice of portions of a draft "Urban Forest Management Plan" (draft plan), dated April 20, 2015, which a private contractor prepared for the City. The portions of the draft plan provided to us identify the purposes and benefits of maintaining the City's urban forest, many of which are similar to those identified in the Ordinance, and compare the size of, and cost of maintaining, the City's urban forest to those owned and maintained by other cities in Southern California. Because there is no evidence that the City adopted or implemented any portion of the draft plan, it does not affect our analysis.

[7] Throughout this opinion, we sometimes refer to the four Canary Island Pine trees located in front of the Dusseaults' home as "Tree F-1," "Tree F-2," etc., a designation similar to the one used by the parties at trial and by the City in its records documenting the location and condition of the trees. When viewed from the street, Tree F-1 is located to the left of the Dusseaults' driveway, and Tree F-2, Tree F-3, and Tree F-4 are located to the right of the driveway.

[8] The City does not dispute that, at the time of the incident giving rise to this lawsuit, it owned the Canary Island Pine trees in front of the Dusseaults' property because they were located in a public parkway.

6

In addition to Trees F-1 through F-4, there were shrubs inside the city-owned parkway that the prior owners of the Dusseaults' home had planted. The Dusseaults maintained the shrubs using a sprinkler system that they owned.[9] The sprinkler system also irrigated the city-owned trees, which may have caused them to grow between 40 to 50 feet taller than they would have grown with only natural irrigation.

The City inspected the trees in front of the Dusseaults' property on three occasions between 2006 and 2008. In April 2006, the City inspected Trees F-2 and F-3 after Sarah Dusseault reported that Tree F-3 had started to lean toward the family's house. The City determined that Tree F-3 did not need to be removed and scheduled Trees F-2 and F-3 for pruning. In April 2007, the City pruned Trees F-2 and F-3.[10] In February 2008, the City removed Tree F-4 after it died.

In early 2011, the Dusseaults re-landscaped the parkway in front of their property. They replaced some of the existing vegetation with drought-resistant plants and shrubs and installed a new drought-resistant irrigation system. A neighbor testified that during the landscaping project, one of the workers hired by the Dusseaults removed chunks of tree roots near the

---

[9] According to the City's Forestry Superintendant, the City allows homeowners to landscape the areas of public parkways that front private property, with the exception that the homeowners cannot remove or otherwise disturb the trees planted in public parkways.

[10] The City's Forestry Superintendant could not recall how frequently the City pruned the trees in front of the Dusseaults' property before it implemented the five-year pruning cycle, but City records show that before April 2007, Tree F-2 had last been pruned in June 1993.

base of Tree F-2, the largest of which was about two feet long and the width of a human fist.

### 3.    The Storm

During the evening of November 30, 2011, a storm carrying hurricane-force winds struck Pasadena.  The storm injured more than 5,000 city-owned trees, more than 2,000 of which were uprooted.  Around 12:30 a.m. on December 1, 2011, Tree F-2 fell, causing severe damage to the Dusseaults' home.  At the time it fell, Tree F-2 was around 100 feet tall.

The storm was unusually destructive for several reasons. First, the storm carried hurricane-force winds, which are measured at 73 miles per hour or higher.  A weather station located about three miles from the Dusseaults' home measured gusts of wind ranging from 79 to 101 miles per hour between midnight and 3:00 a.m. on the night of the storm.  Second, the gusts of wind changed direction rapidly.  Finally, the winds approached the City from an unusual direction.  The Santa Ana winds that frequently strike the City tend to approach from the northeast.  The storm's winds, on the other hand, approached the City from the north and northwest.  Trees are more likely to fall when they are struck by winds that approach from an unusual direction because trees "adapt their roots and their branching structure to a specific wind pattern."

### 4.    Mercury's Lawsuit

Mercury paid the Dusseaults more than $700,000 in insurance benefits for the damage that Tree F-2 caused to their home.  In July 2012, Mercury, as subrogee under the Dusseaults' insurance policy, sued the City for inverse condemnation alleging the City was liable for the damage caused to the Dusseaults'

home because the City owned Tree F-2.[11]  On May 11, 2015, the court commenced a four-day bench trial.

On July 24, 2015, the court issued a statement of decision and entered judgment in favor of Mercury.  The court found the City liable for inverse condemnation on the following grounds:  "1. The tree that fell was a public improvement maintained for a public purpose; [¶] 2. The damage to the residence of Mercury's insured was proximately caused by the public improvement; [¶] 3. The City is strictly liable for the property damage under inverse condemnation; [¶] [and] 4. The doctrine of superseding cause does not apply, under these facts, to the City's liability under inverse condemnation."  The court explained its ruling as follows:  "[T]he Canary Island pine tree that fell on and damaged the [Dusseaults'] residence was a work of public improvement and subjects the City to liability for inverse condemnation.  The damage to the residence of Mercury's insured was proximately caused by the public improvement.  The City's maintenance of a 110 foot tall Canary Island pine tree only 60 feet away from the insured's residence exposed that property owner to a peril from the falling of the tree, caused by whatever event, to which she would not otherwise have been exposed.  Because the tree fell causing private property damage, and was a work of public improvement, the City is strictly liable for the property owner's loss under inverse condemnation.  Were the decision otherwise, the homeowner would bear a loss for damage caused by a public improvement project that is not imposed on other Pasadena residents."

---

[11]    Mercury also alleged claims for dangerous condition of public property and nuisance, but it dismissed those claims before trial.

9

On July 24, 2015, the court entered judgment in Mercury's favor in the sum of $800,000.  On September 22, 2015, the court awarded Mercury $329,170 in costs, including attorney fees, disbursements, expenses, and interest, under Code of Civil Procedure section 1036.  The City timely filed separate appeals from the judgment and the costs order.  We consolidated the two appeals for purposes of briefing, oral argument, and decision.

## DISCUSSION

### 1.    General Principles of Inverse Condemnation

Article 1, section 19 of the California Constitution allows a property owner to recover "just compensation" from a public entity for private property that is "taken or damaged for a public use." (*Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 362.) "When there is incidental damage to private property caused by governmental action, but the governmental entity has not reimbursed the owner, a suit in 'inverse condemnation' may be brought to recover monetary damages for any 'special injury,' i.e., one not shared in common by the general public." (*Ibid.*)

In inverse condemnation, a property owner may recover from a public entity for "any actual physical injury to real property proximately caused by [a public] improvement as deliberately designed and constructed ... whether foreseeable or not." (*Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 263–264 (*Albers*).)  Thus, a public entity generally is strictly liable for any damage to private property caused by a public improvement as that improvement was deliberately designed, constructed, or maintained.  (*Pacific Bell v. City of San Diego* (2000) 81 Cal.App.4th 596, 610 (*Pacific Bell*).)  Inverse condemnation liability does not arise out of general tort liability, such as negligent acts in the day-to-day maintenance or operation of a

10

public improvement.  (*Cal. State Automobile Assn. v. City of Palo Alto* (2006) 138 Cal.App.4th 474, 479 (*Cal. State Automobile Assn.*).)  " 'The destruction or damaging of property is sufficiently connected with "public use" as required by the Constitution, if the injury is a result of dangers inherent in the construction of the public improvement as distinguished from dangers arising from the negligent operation of the improvement.'  [Citation.]" (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 87 (*Paterno*).)

The fundamental policy "underlying the concept of inverse condemnation is that the costs of a public improvement benefiting the community should be spread among those benefited rather than allocated to a single member of the community."  (*Pacific Bell*, *supra*, 81 Cal.App.4th at p. 602.) Thus, as the California Supreme Court explained in *Albers*, the primary consideration in an inverse condemnation action is " 'whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.' "  (*Albers*, *supra*, 62 Cal.2d at p. 262.)  In other words, "[i]nverse condemnation liability ultimately rests on the notion that the private individual should not be required to bear a disproportionate share of the costs of a public improvement." (*Belair v. Riverside County Flood Control Dist.* (1988) 47 Cal.3d 550, 566.)

2. **The City is not inversely liable because Tree F-2 was not a work of public improvement and the City's tree maintenance plan was not deficient.**

The City contends the trial court erred in finding it liable in inverse condemnation because Tree F-2 was not a work of public improvement.  Specifically, the City argues that because there is no evidence that the City planted the tree as part of a

11

construction project serving a public purpose, such as a roadway beautification project, the tree was not a work of public improvement as that term is used in the inverse condemnation context. We agree.

A public project or improvement is a "use which concerns the whole community or promotes the general interest in its relation to any legitimate object of government." (*Bauer v. County of Ventura* (1955) 45 Cal.2d 276, 284.) Whether something is a public improvement is a question of law. (*Barham v. Southern Cal. Edison Co.* (1999) 74 Cal.App.4th 744, 752.) We therefore independently review the trial court's finding that Tree F-2 "was a public improvement maintained for a public purpose."

Only three published decisions have addressed inverse condemnation claims arising out of a public entity's ownership of trees, none of which held the entity inversely liable. (See *Regency Outdoor Advertising, Inc. v. City of Los Angeles* (2006) 39 Cal.4th 507 (*Regency*); *City of Pasadena v. Superior Court* (2014) 228 Cal.App.4th 1228, 1234 (*City of Pasadena*); *Boxer v. City of Beverly Hills* (2016) 246 Cal.App.4th 1212 (*Boxer*).) Only two of those opinions, *Regency* and *City of Pasadena*, discussed whether a city-owned tree qualifies as a work of public improvement for purposes of inverse condemnation.[12]

---

[12]  *Boxer* addressed only whether the alleged property interest that was damaged by the city's trees (a right to unobstructed views from one's property) constitutes a sufficient property interest to support an inverse condemnation claim. (See *Boxer, supra*, 246 Cal.App.4th at pp. 1217–1225.) The court held that such a property interest is not, by itself, sufficient to give rise to a claim in inverse condemnation without discussing whether the city's trees constituted public improvements. (*Id.* at pp. 1219–1225.)

12

In *Regency*, the California Supreme Court affirmed a judgment in favor of the City of Los Angeles on a billboard company's inverse condemnation claim. In that case, the city had planted palm trees on its own property along both sides and in the median of Century Boulevard as part of a project to beautify the road. (*Regency*, *supra*, 39 Cal.4th at p. 513.) Regency, a company that owned billboards along Century Boulevard, sued the city in inverse condemnation, claiming that the palm trees obscured the public's view of the company's billboards. (*Id.* at pp. 513–514.) Regency alleged that the city's planting of the palm trees in front of the billboards resulted in a taking of the company's " 'right of visibility,' " which the company claimed entitled it to compensation from the city. (*Id.* at p. 516.) The court rejected Regency's theory of inverse condemnation liability, holding that a property owner's interest in having its property viewed by the public, by itself, does not constitute a sufficient property right to give rise to an inverse condemnation claim. (*Id.* at pp. 519–523.)

As part of its analysis, the court assumed that the planting of trees along a city-owned street as part of a highway beautification project constituted a public improvement for purposes of an inverse condemnation claim. (*Regency*, *supra*, 39 Cal.4th at pp. 521–523.) The court recognized that the city's project benefited the public generally and served a public purpose—i.e., the maintenance and improvement of city-owned roads. (*Id.* at pp. 521–522.) The court also observed that in exercising its power to maintain and improve the city's road system, " '[the government] may plant shade trees along the road to give comfort to motorists and incidentally to improve the appearance of the highway. By so doing [the government] aims to make a better highway than a mere scar across the land would

13

be.  If trees interfere with the view of the adjacent property from the road, no right is interfered with.'  [Citation.]"  (*Id.* at p. 521.)

In *City of Pasadena*, the appellate court reviewed an order denying the City's motion for summary adjudication of Mercury's claim for inverse condemnation arising out of residential damage caused by a different city-owned tree that fell during the November 2011 storm.  In that case, the City also argued that " 'a tree is not a work of public improvement that is the proper subject of an inverse condemnation action.' "  (*City of Pasadena, supra*, 228 Cal.App.4th at p. 1231.)  The trial court denied the City's motion, concluding there was sufficient evidence to send the claim to trial because a trier of fact could find the subject tree was a public improvement to support an inverse condemnation claim.  (*Id.* at p. 1232.)  The City filed a petition for writ of mandate challenging the trial court's ruling, which was denied.  (*Id.* at pp. 1232–1236.)

As a threshold matter, the reviewing court noted that a public improvement is a project or use that involves "(1) a deliberate action by the state (2) taken in furtherance of public purposes."  (*City of Pasadena, supra*, 228 Cal.App.4th at p. 1234.)  The court then examined *Moerman v. State of California* (1993) 17 Cal.App.4th 452 and *Wildensten v. East Bay Regional Park Dist.* (1991) 231 Cal.App.3d 976 (*Wildensten*), two cases that define when a public entity has not engaged in any deliberate action that would give rise to an inverse condemnation claim.  (*City of Pasadena, supra*, at p. 1234; see also *Moerman, supra*, 17 Cal.App.4th at pp. 456–459 [no deliberate action when the entity does not control the movements of wild animals on state land that cause damage to a plaintiff's property]; *Wildensten, supra*, 231 Cal.App.3d at pp. 978–981 [no deliberate action when the entity does not improve or stabilize raw land that it owns and which causes damage to the plaintiff's property during a

14

landslide].) Next, the court looked to *Regency* for guidance in determining whether the planting of a tree can constitute a "public purpose." (*City of Pasadena*, at pp. 1234–1235; see also *Regency*, *supra*, 39 Cal.4th at pp. 521–523.) Drawing from these cases, the court concluded that "if the instrumentality that allegedly caused the plaintiff's damages (such as a tree) is part of the construction of a public improvement (such as a highway beautification plan), the public improvement element of an inverse condemnation claim is satisfied." (*City of Pasadena*, at p. 1235.)

Ultimately, the court denied the writ petition because a triable issue of fact existed as to whether the City's tree that damaged the insured's home was a work of public improvement. (*City of Pasadena*, *supra*, 228 Cal.App.4th at pp. 1235–1236.) Specifically, the court determined that the City failed to present any evidence demonstrating that the tree was not part of the construction of a public project. (*Id.* at p. 1235.)

Based on *Regency* and *City of Pasadena*, we hold that a tree constitutes a work of public improvement for purposes of inverse condemnation liability if the tree is deliberately planted by or at the direction of the government entity as part of a planned project or design serving a public purpose or use, such as to enhance the appearance of a public road. Our holding comports with the requirement for inverse condemnation claims that the complained-of damage must be caused by an improvement that was "deliberately designed and constructed." (See *Albers*, *supra*, 62 Cal.2d at p. 263.) Indeed, in virtually every case affirming inverse condemnation liability, the responsible public entity, or its predecessor, deliberately constructed the improvement that caused damage to private property. (See, e.g., *id.* at pp. 254–255 [a county's construction of roads caused a landslide]; *Pacific Bell*, *supra*, 81 Cal.App.4th at pp. 599–601, 607–610 [water main pipes

15

constructed and maintained by a city burst and flooded private property]; *Cal. State Automobile Assn.*, *supra*, 138 Cal.App.4th at pp. 476–484 [sewage pipes constructed and maintained by a city backed up and flooded private property]; *Imperial Cattle Co. v. Imperial Irrigation Dist.* (1985) 167 Cal.App.3d 263, 269–271 [drainage structure constructed and maintained by a public entity flooded private property]; *Aetna Life & Casualty Co. v. City of Los Angeles* (1985) 170 Cal.App.3d 865, 872–874 [power lines constructed and maintained by public entity sparked and caused a fire that damaged private property].)

Our holding is also consistent with a fundamental justification for inverse condemnation liability: the public entity, acting in furtherance of public objectives, took a calculated risk that damage to private property may occur. (*Yox v. City of Whittier* (1986) 182 Cal.App.3d 347, 355; see also Van Alstyne, *Inverse Condemnation: Unintended Physical Damage* (1969) 20 Hastings L.J. 431, 491 [proceeding with a public project without incorporating necessary prevention measures for known risks is a "deliberate policy decision to shift the risk of future loss to private property owners rather than to absorb such risk as a part of the cost of the improvement paid for by the community at large"].)

Here, there is no record of who planted Tree F-2 or for what purpose it was planted. All we know is that the tree was planted on Hillside Terrace in the late 1940s or early 1950s. At the time the tree was planted, it was not the same species as the type of tree that the City had designated as the official street tree for Hillside Terrace. There is therefore nothing to suggest that the City planted the tree as part of a planned project or design to beautify its roads, or to serve some other public purpose. There is also nothing to suggest that the City took a calculated risk by planting Tree F-2, or any other tree, near the Dusseaults'

property. Other than owning Tree F-2 and pruning it in 1993 and 2007, there is no evidence the City took any deliberate action before Tree F-2 fell in 2011. (See *Wildensten*, *supra*, 231 Cal.App.3d at pp. 979–981 [mere ownership of undeveloped land, without more, cannot form the basis for an inverse condemnation claim].) In short, Tree F-2 was not a work of public improvement.

We also reject Mercury's argument that the City's adoption of the Ordinance converted Tree F-2 into a work of public improvement because the Ordinance promotes the public's interest in maintaining trees. The Ordinance was adopted in 1992, several decades after the tree was planted. It therefore could not have had any bearing on how or for what reason Tree F-2 was planted. Further, although one of the Ordinance's general goals is to preserve and grow the City's canopy cover, it does not establish specific design standards or parameters for the planting or removal of street trees, nor does it include any maintenance or pruning schedules for street trees like Tree F-2. We also note that there was no showing that the City's articulated public policy of promoting urban forestry reduced the value of private abutters' property. (See *Regency*, *supra*, 39 Cal.4th at pp. 522–523 [if a street is ornamented so as to be more beautiful, the public is benefited generally and the abutter is benefited specially]; *Clement v. State Reclamation Bd.* (1950) 35 Cal.2d 628, 642 ["The decisive consideration [in an inverse condemnation case] is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking."].) Quite simply, the Ordinance does not constitute a design for a public project or improvement, nor does it convert Tree F-2 into a work of public

17

improvement, that subjects the City to inverse condemnation liability.[13]

Citing *Marin v. City of San Rafael* (1980) 111 Cal.App.3d 591, Mercury contends that it is immaterial to an inverse condemnation analysis whether the City planted Tree F-2 because the City has since taken ownership of the tree and assumed responsibility for maintaining it as part of an urban forestry program. In *Marin*, a city was held inversely liable for property damage caused by a city-owned storm water drainage pipe that had been extended onto private property with the city's approval and at the city's direction. (*Id.* at pp. 593–596.) Because the city had approved and substantially participated in the construction of the extension, and because the city conceded ownership of the storm water drainage system to which the extension was connected, the reviewing court found there was sufficient evidence to hold the city inversely liable for damage caused by a work of public improvement the city had deliberately designed and constructed. (*Id.* at pp. 595–596.) Mercury's reliance on *Marin* is misplaced. Unlike in *Marin*, there is no evidence that the City converted a private improvement to public use, or deliberately designed or helped construct the improvement.

---

[13] For similar reasons, the City's Master Street Tree Plan does not constitute a design for a public improvement or convert Tree F-2 into a work of public improvement. Like the Ordinance, the Master Street Tree Plan was adopted several decades after Tree F-2 was planted. In addition, the Master Street Tree Plan does not contain specific design, maintenance, or removal requirements—it only establishes a general policy favoring uniformity among the trees that are planted on each of the City's streets.

Nor is there any evidence that the City's tree maintenance plan established a taking for inverse condemnation purposes. To establish an inverse condemnation claim based on a government entity's maintenance of one of its improvements, the property owner must show that the plan of maintenance was deficient in light of a known risk inherent in the improvement. (See *Paterno*, *supra*, 74 Cal.App.4th at pp. 87, 90 [distinguishing between a negligent government *policy* or *plan* and negligent *conduct* by government employees]; see also *Arreola v. County of Monterey* (2002) 99 Cal.App.4th 722, 742 ["So long as the entity has made the deliberate calculated decision to proceed with a course of conduct, in spite of a known risk, just compensation will be owed."].) For example, in *Pacific Bell* and *McMahan's of Santa Monica v. City of Santa Monica* (1983) 146 Cal.App.3d 683, disapproved on other grounds in *Bunch v. Coachella Valley Water Dist.* (1997) 15 Cal.4th 432, 443, the cities were held inversely liable for flooding damage caused by the cities' water-main pipes where the cities employed policies of waiting until the pipes broke or malfunctioned before replacing them. Liability in both of those cases turned on the fact that the cities' plans for remedying known risks in their water-main systems were inadequate. (*Pacific Bell*, *supra*, 81 Cal.App.4th at pp. 607–610 [upholding inverse condemnation claim based on break in a cast-iron city water pipe; city was aware all such pipes needed to be replaced, but maintained a policy of waiting until a pipe broke before replacing it]; *McMahan's of Santa Monica*, *supra*, 146 Cal.App.3d at pp. 696–698 [damage caused by break in city-operated water main that had been in use 51 years despite an assumed lifetime of 40 years; maintenance program to replace pipes itself was inadequate].)

In this case on the other hand, the City's five-year cycle for inspecting and caring for City trees was not only adequate, the

19

undisputed evidence established that it exceeded the standards used by most other cities.  In other words, there is no evidence that the City made " 'a deliberate policy decision to shift the risk of future loss to private property owners rather than to absorb such risk as a part of the cost of the improvement paid for by the community at large.' " (*Paterno*, *supra*, 74 Cal.App.4th at p. 86.)

In sum, we conclude that Tree F-2 was not a work of public improvement because there was no evidence it was planted as part of a planned project or design serving a public purpose or use.  We also conclude that the City's tree maintenance plan, as implemented by the City Manager under the Ordinance, does not subject the City to liability for an inverse condemnation claim because no evidence was presented that the plan was deficient.  Because the City could not be held inversely liable for the damage caused to the Dusseaults' home by the tree, we reverse the judgment.[14]  Our holding, of course, does not immunize the City from all forms of liability for damage caused by its trees.  In a case like this, a property owner (or subrogee) may still sue the public entity for, among other claims, dangerous condition of public property.  (See Gov. Code, § 835; see also *Milligan v. City of Laguna Beach* (1983) 34 Cal.3d 829, 834 [a public entity is not immune from liability for a dangerous condition of public property created by a city-owned tree that damaged adjacent private property].)

---

[14]     In light of our holding, we do not reach the City's arguments that the court also erred in finding the tree proximately caused the damage to the Dusseaults' home and by rejecting its contention that the November 2011 storm was a superseding cause that cut off the City's liability.

## DISPOSITION

The judgment and the post-judgment order awarding costs to Mercury are reversed. Upon issuance of the remittitur, the trial court shall enter judgment in favor of the City. The City shall recover its costs on appeal.

## CERTIFIED FOR PUBLICATION

LAVIN, J.

WE CONCUR:


EDMON, P. J.


JOHNSON (MICHAEL), J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.